Thank you. Ben Nissenbaum appearing for the plaintiff and petitioner Teresa Sheehan. And I'd like to reserve three minutes of my time. May it please the court. This case turns on the plaintiff's severe psychiatric disability, the defendant's lack of consideration for it, and the extent to which Ms. Sheehan posed a danger while she was contained and isolated in her room. Now, this court has previously found that attempting tactics of persuasion and questioning and using time as a tool are examples of less intrusive options that are available to officers who are dealing with a person of known diminished capacity. And that person is Ms. Sheehan. Now, by the time the officers in this case force entry the second time into Ms. Sheehan's room, and this time it's not done with a key, but it's done by breaking down the door, literally shouldering, kicking the door, shouldering it open, they know to any reasonable degree that Ms. Sheehan was alone in the bedroom. Now, the pivotal fact, it seems to me in this case, in all of the circumstances, and I'd just like you to incorporate that in the thing, is that she is clearly upset and she's armed with a very wicked-looking knife. And she is, unlike the Glenn case, with which I'm familiar, where the young man was hit with the beanbags and retreated, and where he was threatening himself with a smaller knife. In this case, we have a circumstance where the police officers are confronted with a clearly upset, irrational woman who is holding a knife. By her own statement, she has it raised. Now, whether it's brandishing or pointing or whatever, but there's no doubt that she has a knife. So how does that factor into the officers' objectively reasonable assessment of what was appropriate? Well, I think the first question, under the totality of the circumstances, is how did they get to that point? And, of course, there were two entries into this bedroom. And the first entry was made with a key where Mr. Hodge opened the door. And at that time, the officers, of course, backed out of the room, and Ms. Sheehan closed the door on the officers. Yes, but she had a knife. She did have a knife. But up to that point, it's important that she's not continuing her attack, that she closed the door on the officers. And by this point, the officers have confirmed virtually everything that Mr. Hodge has told them about her mental disability. And so now the question is, what is the reason for why they break the door down? Well, counsel, I guess I'm having some of the same concerns, I guess, as Judge Fisher, because you're describing it as if having a mental disability is a king's ex, so that if a completely sane person brandishes a knife at an officer to resist arrest, that might yield one result. But if you're mentally ill and you brandish a knife in exactly the same way, in exactly the same circumstances, somehow the officer has less opportunity to do whatever the officer does. So I'm not sure where that gets you in the objective circumstance, or if it does get you some, whether it helps you. Because if a person is sane, then you can hope to reason the knife out of their hand. If they're not, it makes the situation even more dangerous, doesn't it? Well, I think the key, though, is in no way am I saying that being mentally ill excuses a person. I'm not saying that, nor am I saying that there are two tracks here. What I'm saying is that the officers, when they decide that they're going to break the door down a second time, this is a decision that completely disregards her mental disability, and it directly causes the act that then causes them to shoot her. And at that point- Well, if somebody is high on drugs, their mental state is agitated and out of control. So if Judge Graber is sane, what are you saying? What they have is a woman who is agitated, aggressive, and has a very dangerous knife. Well, I guess that immediately raises in law enforcement officers normal law-keeping assessment that she's an armed- and our case is recognized. Somebody with a knife poses a danger. And if they're advancing on the officers- and take your point, she shut the door, but then she was still armed with a knife, and she had advanced. She didn't retreat immediately or huddle on the bed or whatever. She was aggressive with the knife. So whatever her mental disability was, you still got that behavioral pattern. So if you could focus on that and help us understand what it was that the officers did wrong. That's what I'm trying to do. And the wrongdoing here, the violation here, is the breaking the door down. So it's the second entry. It's the second entry. And it seems to me that certainly with the benefit of hindsight, there were better options for the officers. They may have made a mistake. But the question is, how much of a mistake does it have to be before they lose qualified immunity? My view on that is simply this. It's not a question that they had called for backup and didn't know if backup was coming. They heard the sirens. In fact, they sent Mr. Hodge downstairs to open the door. I understand. That's why I said it may well have been a mistake. But how do we know where that line is between a mistake that qualified immunity protects and a mistake that is so egregious that qualified immunity does not protect? I think you have to look at the training. You have to look at what the accepted standards are in dealing with a person of diminished capacity, whether it's drugs or another cause, as it was here. I don't think it makes a big difference that it's a psychiatric disability for purposes of the Fourth Amendment. The real issue, frankly, is at the time that they break this door open, before that moment, what do they know? They know that if this woman is provoked, that if they confront her, they know she has a knife and they know that she may charge at them. They know she may attack. She walked towards them with a knife previously. But what happens? She did not complete the attack. She closed the door on them. So they know at that point that without opening the door, it is highly unlikely that she's going to continue the assault. They know they have resources that are on the way. And it seems that based upon all that... Which might or might not have a different result. Well, we'll never know. Well, we won't. But qualified immunity is designed, I think, to prevent second guessing to some extent. So let's say there had been four officers instead of however many there were, or six, and they had charged into the room. How do we know that would have gone better? Well, I think what we know is that it's not that they would have just had more officers. They would have had the opportunity to have a person there who could talk to Ms. Sheehan through the door, who could talk her down, if you will. At the end of the day, I think Giordi is instructive and does set a bright line that the officers must render aid that reasonably takes her disability into account. And the question is, at the time that they break this door open, and whether it's called a mistake, and I understand the importance of that language, the question is, was that a reasonable thing to do at that moment? And the answer can only be no. I mean, every officer at this point in time, certainly by when this incident occurred, and even by the defendant's own training materials, by the city and county of San Francisco's own training materials, knows that when you're dealing, or has been trained, that when you're dealing with a person who's like this, the first thing you want to do is make sure that you have the time to deal with them so that you don't compress it into a situation like this one. So the officers knew that or should have known it. So that's with respect to the... And are there no circumstances present in this case where, with the door closed, there was any justification for worrying about danger to herself or danger to others? Not in any reasonable degree. If you look at Fisher, the Fisher case, it's instructive. And it's instructive because it tells you that the officers cannot benefit from consideration of every possibility that could have theoretically transpired. For example, could she have jumped out the window? It's possible. But, of course, they had backup that was going to the back. Now, this is not a window that's at ground level. This is a window that's at a height. Far up. Could she have physically done it? She could have physically jumped out of it. Would she have survived it? She would have been significantly injured. The officers had to go up a flight of stairs. She may have survived the fall. I don't know the answer to that. But it doesn't seem like a logical thing to assume, number one. In addition, you know, the judge, Judge Breyer, certainly gave credence to the possibility that she might commit suicide and relied on this form in part that Heath Hodge had presented the officers. Of course, danger to self was not checked on that form, and there's no indication that she would. Well, what difference does it make what the form said? When the person is in there in an excited, aggressive mental state armed with a knife, that's the most relevant information, not what was on the form based on a prior observation. So why wouldn't it have been? Well, I'll put it this way. Did the officers say that that's one of the things that they were worried about? Yes, they did testify to that possibility. Now, what you're saying is that they thought that was one of the things, and you're saying it's objectively unreasonable for them to have believed that she might commit suicide. I'm saying that that is pure speculation. That is not support. Why is it pure speculation? You have a deranged individual with a knife. The case of Glenn was overtly threatening himself with the knife. Correct. Okay, so it's not inconceivable that you've heard of suicide by cop, correct? Of course. All right, so you're saying it's just objectively unreasonable and no officer in these circumstances could have thought that suicide was a possibility. Not more than just speculation, but that it was a reasonable possibility. Well, I think to make that jump, you would have to have some information from Mr. Hodge. Why? Why would you have to? You have a person armed with a knife who is mentally ill. Because it's lumping every person who's mentally ill as saying that because you're mentally ill, that means there's a possibility of suicide. No, no, no. It's every person who's mentally ill armed with a knife who's been aggressive to you. We're not generalizing here. Counsel, look, I'm sympathetic. This is awful that this woman got shot. She's lucky she survived. And it is troublesome that someone who needs help winds up in a confrontation like this. And if, as Judge Graber said, these officers made mistakes, the issue before us that you have to deal with is what Judge Breyer dealt with in the district court, which is, is it so far over the edge that it becomes one which is objectively unreasonable and they lose qualified immunity? Again, the answer to that is yes, even based on their own training materials. This is a situation where you do not compress the time. You want to expand the time. This is a situation where you don't confront the person. You allow space. And the importance is the door, because the door is a barrier. That means that she's not going to attack the officers. And ultimately- No, that's why we were talking about escape and suicide. Right. That's a fair point. There's a barrier there. And the other thing, as noted previously by the court, in a situation like this, ultimately using lethal force following, attempting to protect a person possibly from suicide, it leads to a very odd result. Yeah. Thank you, counsel. We asked a lot of questions, so you may have a minute for rebuttal when the time comes. Good morning, Your Honors. May it please the Court, Peter Keith for the San Francisco City Attorney's Office on behalf of the appellees. I'd like to begin by addressing the issue that Judge Graber raised, which is what is the legal standard for the degree of, I guess, permissibility or deference or range of reasonable conduct that we give to the police under these circumstances. And if we look at the Supreme Court's more recent decisions regarding qualified immunity, we find a lot of instructive language. For example, in the Ashcroft versus Al-Kid case, it says that existing precedent must have placed the statutory or constitutional question faced by the officials beyond debate. Well, I think every police officer at this time and place had to know that they couldn't use excessive force. If somebody said, I don't like you, and stuck out their tongue, they can't shoot them dead. I mean, everybody knows that there's that rule. And the question is how to apply it. So it does seem to me that the officers made some mistakes here. If they had waited, they might have well avoided the situation as it unfolded, because of time, because of talking through the door, because of having additional people there and maybe not having to use a firearm. But so how do we know when we reach the dividing line between a mistake that qualified immunity protects and a mistake that's so far over the line factually that the legal standard isn't met? How do we know that place? Well, Your Honor, I think, I mean, we say, would every reasonable officer have known that this just was not a reasonable option, that this was outside the range? I mean, I realize that's a more abstract formulation, but that's ultimately what we have to ask ourselves. And so I think if we go over it. So why would any reasonable officer have done what they did, I guess, is another way. If you can justify that a reasonable officer would do this, I guess that is a factual answer. Well, Your Honor, we can look at what facts were known to the officers, what undisputed facts were known to them. Once Ms. Sheehan closed that door, the officers had no information about what she was doing behind that door. They were at a tactical disadvantage because they had no information. She could have escaped out the back window and harmed civilians. Wait a minute. No, she really couldn't. I'm sorry, Your Honor. She couldn't have escaped jumping out the window. That's a ridiculous assumption. Go ahead. Your Honor, the officers didn't know for certain whether they were about the means of aggress from the back. They knew there was a window there. In fact, the record shows there was a fire escape there. In many flats in San Francisco, there's a grade in the back so that the surface can be closer to the ground in the back. Ms. Sheehan had just behaved very irrationally by attacking the officers with a knife. It was not a foregone conclusion that she could not escape. Moreover, it's undisputed that as of the time the officers, when Ms. Sheehan closed the door, backup still had not gone around the back to cover the back. That was the information. That was Sergeant Reynolds' testimony, that she had not yet received confirmation that the back of the residence was covered. Moreover, another, and putting aside for a moment the possibility of Ms. Sheehan's escape to harm civilians, granted the door had just been closed, but one couldn't say to a certainty that Ms. Sheehan wasn't going to come out again. Recall that the knife that she picked up was one of several knives that were next to her bed. She could have been rearming herself with those knives, whether with an intent to come out and attack the officers or with an intent to throw those knives at the officers if they tried to come in. I'm looking at the picture in the record where she's at the end of a hallway, correct? The room is at the end of a hallway. So the officer didn't have to stand right up against the doorway. They could have stepped back, and if they drew their weapons under those circumstances, we'd have a different case. So she did open the door. As counsel says, once the door is shut, she's in the room, and then now you're so she's contained, as they argue. The situation is contained. So the idea that they have to break the door down because they have no other objectively reasonable ability to react is questionable. Now, you've addressed the issue of escape. You raised the notion of destruction of evidence. How would she be destroying evidence? Well, Your Honor, specifically by hiding or discarding the knife that she used to attack the officers. In her apartment, she's going to hide the knife, and they're never going to find it in the knife in the apartment? Your Honor. They're going to throw it out the window? This is a bit of a hoarding situation. It's not clear. I mean, yes, possibly eventually they could have found it. That's a reach. Let's say that one's a reach. What else would they have claimed that they were thinking about might happen behind that closed door? Well, certainly there was a concern that she could harm herself, given that her behavior had been escalating from threats to Hodge to attacking them. It was very difficult to predict what she might do next, given what they'd known had transpired so far and given her mental health history. The problem is that they used force that could have resulted in killing her. So your argument is to protect her, they shot her and might well have killed her. With respect, Your Honor, that isn't our argument. Right now my discussion has been focused on the reasonableness of the officer's decision to open the door. I mean, apart altogether from the lawfulness of their decision to open the door. But what happened when the officers opened the door, recall they were prepared. They didn't know what was going to happen when they opened that door. They had pepper spray at the ready with the hope that they could use that pepper spray to disable Ms. Sheehan was that Ms. Sheehan cornered Officer Holder against a wall, and literally so close that Officer Holder could not raise her arm to shoot. She had to shoot from the hip. But there's one other aspect that we haven't discussed that is of concern to me, and that is the number of shots that were fired. Why isn't there an unreasonableness to the level of shooting that happened here? You know, one shot is, to me, quite understandable in the circumstances as they unfolded. But beyond that, it seems like there was more than had to be done. Well, let me address that first from a factual perspective. The record doesn't contain any sort of a factual suggestion that there is some standard under which an officer is supposed to fire and then wait to see what the results of that shot are before deciding to fire again. And we would expect at trial that there would be evidence on that. But there is nothing one way or the other in the record from a police practices standpoint to suggest that firing more than one shot is problematic. But what about firing into the torso and then firing into the head, which I think is the allegation? Well, Your Honor, the idea, I mean, under the law, a deadly force is justified when there's a threat of serious physical injury or death that's posed by a subject, and that threat existed here. And until that threat is conclusively eliminated, officers are permitted to use that deadly force. And that's what the cases that we cited state. Multiple shots. Well, let's focus on the last shot. Even if the double tap to the chest is normal police practice in a deadly force situation and then her partner opens up, the lieutenant opens up, why did she need to then fire at her when she was on the ground? Well, Your Honor, what the testimony shows is that, essentially, Ms. Sheehan had reached the ground by the time the shot was fired. But what the testimony also shows is that this was a very fast-moving incident. And, again, if we look to the other cases, for example, for the Berube v. Conley case in the First Circuit that we cited in our brief, it's that when you have a threat, when an officer has a threat that's this close, they have to keep firing until that threat is done. And we're not going to second-guess the fact that the officer ---- They're standing over her? She was in control of the situation at that point? She's on the ground? What was she going to do? Your Honor, with respect, under the undisputed facts, she was not in control of the situation. Ms. Sheehan was armed on the ground, flailing with a knife. Officer Holder was still cornered. How was she? Well, she's on the ground, and she's been hit by at least two shots, correct? She's been hit by five by ---- Well, she was hit by a total of five shots, Your Honor, but she was still ---- Fifth shot was when she was on the ground. That's right. And even after that shot, Your Honor, it's undisputed, she was still flailing with the knife at Officer Holder, and she continued to do so until Officer Zachos finally arrived and came and kicked the knife out of her hands. So the threat was still present. And the lieutenant couldn't have kicked it out of her hand? Sergeant Reynolds, I think it all happened. I thought she was a lieutenant. Is Reynolds just a sergeant? She's a sergeant, yes, Your Honor. It all happened, Your Honor, that quickly. Perhaps she could have done it. But, again, the officers are trying to figure out ---- Is that a disputed fact, or is that a ---- What is undisputed is that she had office, is that Ms. Sheehan on the ground was flailing with the knife within striking distance of Officer Holder, and Officer Holder was still cornered. And, again, all these shots happened in very quick succession. And so to say ---- I think that there is a ---- Well, that may be because when officers start shooting, they're shooting. That doesn't mean the whole array of shots is necessarily reasonable. Oh, well, yes, Your Honor, I think if the circumstances have changed and the officer has time to register the change in circumstances, then we might be able to ---- Your Honor, all I can say is that these shots happened very close together, even when she was on the ground. We're talking about whether there's now ---- I'm asking you whether there's disputed issues there that a jury should take a look at. Well, Your Honor, again, if we look to the legal standard, it's does the person pose a threat of death or serious physical injury, and then we give the officer the deference under the Graham standard of realizing that these are tense, fast-moving circumstances. And can we say that every reasonable officer would have, upon seeing Ms. Jehan start to fall, make the connection that I need to stop firing now, notwithstanding that she's still within striking distance of a cornered officer. It's a different I. That is, the first shots were fired by the person who was cornered. The second set of shots were fired by someone else who was not cornered. Correct? She was not cornered, but she was within striking distance of Ms. Jehan herself, and Ms. Jehan had turned towards Sergeant Reynolds. Well, insofar as your argument is, well, the person who had been cornered has to have time to register it, it's a different person. And so perhaps there's a different set of, not criteria, but a different outcome as to the second person. Your Honor, everyone was in very close quarters, and that is undisputed, and that is shown in the diagram that's attached to Judge Breyer's order, the locations of the officers. And, again, this is happening so quickly in such close proximity, to say that within a matter of a fraction of a second, an officer should have retreated instead of firing the last shot, it's, again, it ignores the fact about how close Ms. Jehan was, that Officer Holder was still cornered. And these facts, again, are undisputed. And, again, going back to the qualified immunity standard, the question is would every reasonable officer have made the decision that I can stop firing once I see this person starting to fall, notwithstanding that she still has the knife and is still armed and still poses a danger? Is it a fact that the undisputed fact that the last shot was fired when she was starting to fall? Your Honor, I think what the record shows is that all of these shots happened close together, and that the way that Officer Holder described it, whose testimony we're relying on for Ms. Jehan being on the ground when the final shot was fired, Officer Holder's testimony is that Ms. Jehan was falling toward the ground and stabbing toward Sergeant Reynolds' legs and then was on the ground when Sergeant Reynolds fired. And Ms. Jehan herself, likewise, I mean, she was standing for the first shot and was only starting to go down to the ground for the last shot. So what I think is undisputed that the record tells us is that this is all happening very quickly and that the officers are having to make the decisions very quickly. So, Your Honor, I do want to make one last point about the plaintiff's challenge to the entry. Recall that under the Billington case, courts don't tell officers, if you could have used different tactics to avoid a deadly force situation, we're going to hold you liable if a deadly force situation ends up resulting from your tactical decisions. And the exception that Billington makes is for when that tactical decision is an independent Fourth Amendment violation. And here, if we look at the officer's decision to continue trying to detain Ms. Jehan to go and to try to get into the room after the door is closed, we have legal justifications for that entry. The same exigency still existed, which under the Fisher case and the Michigan case, I'm sorry, the Supreme Court case of Michigan versus Tyler. The same exigency still existed, so that entry is lawful. Ms. Jehan had just committed a violent felony against the officers and had attempted to flee back into her room. The same need to 5150 her still existed, and the officers still had to go in to make that arrest. So that was a lawful entry, and under Billington, we don't start to ask, was it reasonable for the officer to do this particular tactic before the time the deadly force was used? Certainly, the officers had tactical options when deadly force was used. That is a consideration, but I think that the focus on the entry really, under the law, doesn't matter because the entry itself was lawful. Thank you, counsel. Thank you, Your Honors. Thank you. I'm glad we got to the last shot and the excessive shooting. Of course, there were five shots that were fired. The last shot was fired when Ms. Jehan was on the ground. That is certainly testimony from Officer Holder, and that testimony, if it is credited. And bear in mind, Officer Holder is the one who Reynolds claims is in danger when the last shot is fired, and that's Officer Reynolds who fires the last shot. Officer Holder doesn't fire a shot when Ms. Jehan is on the ground, and that's because she's- Where's Holder? What's that? When is Holder in to fire? She has her gun in her hand. She would have to fire downwards. She's standing back into, as she describes, back against the wall, kind of at the end of the hallway. At that point, her partner is shooting, right? Her partner is shooting, correct. And Ms. Jehan is on the ground. You're faulting Holder for not shooting in those circumstances? I'm not faulting her. I'm saying there was no- Is there an evidentiary point you're making? I'm just trying to understand. It's a two-edged sword. I'm just saying if Holder had made the same and got the same impression, she would have started firing, but she didn't. She didn't fire. But her partner was firing. Yes. So Holder, under one view, acted with restraint. You're arguing that it's proof that there was no need for Reynolds to fire. What I'm saying is that at the point in time when Ms. Jehan fell to the ground, at that point in time, Holder perceived that there was not a threat to her, whether or not it was- Is that what Holder said? I'm certainly not a threat to justify shooting Ms. Jehan. No. Counsel, I'm asking you. Was the second non-shooting officer said she didn't shoot because she didn't believe that Jehan was a threat at that point? I would have to grab the citation, Your Honor, and look at it. I know it is in the record. I believe that is her- I think she may have said that. Well, she said something that was vague about that, as I recall, basically saying that Ms. Jehan was moving the knife in this manner, but that Ms. Jehan was on the ground and had been shot already, and she's been shot four times already. Is it disputed that she was fully on the ground when the last shot was fired, or was it continuous, as counsel has argued, a continuous motion downward, so there were three shots, the last of which hit her when she was on the ground? It is disputed. Holder is clear that she was all the way on the ground. Let me clarify the question. It's important, at least as I understand the city's argument. The shooting started by Reynolds when Jehan was standing, correct? Yes. Okay. She fires. Is there any evidence as to how quickly the shots were fired? I know the shots fired by Officer Reynolds happened sequentially quickly. Okay. So the point is that Jehan's in motion and the officer is shooting because she thinks that Jehan is a threat. She's got a knife and she's foiling. The third shot in the sequence, she's hit the ground, but there's not some gap. I'm thinking, for example, of the BART shooting where the guy is down. He's being, you know, the guy pulls out, thinks he's got a taser, and shoots the guy when he's lying flat on the ground. We don't have that situation where we have, as I understand it, is your client falling and the last shot hits her when she's down, but it's not as if there was some interval of time where the officer sort of gave the coup de grace, as it were. It's not a long period of time, but it is a period of time that is after she had fallen to the ground that the officer fired. It was not, as you're describing, bam, bam, bam, bam, or bam, bam, bam. It was not like that. And she did still, by her own admission, have the knife in her hand at that time, correct? She did. She did, and that is undisputed. The other issue that I wanted to say is with respect to, I believe, Glenn, three minutes was ample time in Glenn for the officers to form a decision to retreat and tactically reposition themselves. In this case, Ms. Sheehan, of course, there was a 20-minute period of time when Mr. Hodge had left her room and gone back, and she hadn't tried to escape during that time. And then there's ample period of time after that because you have the officers come to the scene. I think, looking at Glenn, I think what we said was officers need not employ the least intrusive means available so long as they act in a range of reasonable conduct. The available lesser alternatives are, however, relevant to ascertaining that reasonable range of conduct. Accordingly, the availability of these alternatives is one factor we consider in the Graham calculus. Is that the point you're making? That's the point I'm making. And more specifically, Glenn says that attempting tactics of persuasion or questioning and using time as a tool are also examples of less intrusive options. Counsel, you've used your time. We do appreciate the helpful arguments from both counsel in this very challenging case. They were very helpful arguments. The case is submitted, and we will take about a 10-minute recess. Thank you.
judges: Noonan, Graber, Fisher